UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

ROBERTA M. BALLARD,

                              Plaintiff,          **DECISION AND ORDER**

        -against-                                 19 Civ. 673 (PED)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

-------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.:**

## I.      INTRODUCTION

Plaintiff Roberta M. Ballard ("Plaintiff" or "Claimant") brings this action pursuant to 42

U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Defendant"

or the "Commissioner") denying her application for disability insurance benefits and

supplemental security income.  This case is before me for all purposes on the consent of the

parties, pursuant to 28 U.S.C. § 636(c). Dkt.13.  Presently before this Court are the parties'

cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, Dkts. 14 (Plaintiff's motion), 15 (Plaintiff's memorandum of law), 18 (Defendant's

cross-motion), 19 (Defendant's memorandum of law), and 20 (Plaintiff's opposition/reply).  For

the reasons set forth below, Plaintiff's motion is **GRANTED** and Defendant's motion is

**DENIED** to the extent that this case is remanded pursuant to 42 U.S.C. § 405(g), sentence four,

for further administrative proceedings.

## II.     BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security

Administration. Dkt. 10.

## A. Application History

On or about April 30, 2015, Plaintiff filed for disability insurance benefits and supplemental security income, alleging that she had been disabled since April 2, 2015. R. 108, 120, 271. Her claim was administratively denied on or about July 27, 2015. R. 108-131. On or about December 12, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 156-57. A video hearing was held on October 18, 2017 before ALJ Kieren McCormack. R. 58. Plaintiff appeared with counsel and testified at the hearing. R. 58-107. On November 24, 2017, ALJ McCormack issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). R. 8-30. On November 26, 2018, the Appeals Council denied Plaintiff's request for review, R. 1-6, and the ALJ's decision became the Commissioner's final decision. On January 23, 2019, Plaintiff filed the instant complaint. Dkt. 1.

## B. Plaintiff's Medical History

### 1. Physical Medical History

Plaintiff was originally diagnosed with Diabetes Mellitus, Type II, in or about 2009. R. 535. Over the years, Plaintiff's diabetes has affected her vision, resulted in various feet ailments, and appears to have caused some paresthesia in her hands. R. 411, 444. Additionally, Plaintiff has consistently complained of lower back pain, neck pain, knee pain, wrist pain, and sciatica throughout the relevant period. *See, e.g.*, R. 451-53, 455, 535-39, 726.

On March 10 and April 1, 2014, Plaintiff complained of left sided back pain shooting down her posterior left leg to the knee and left buttock pain radiating down her leg once per week. R. 451, 465. She was diagnosed with Acute Sciatica, R. 453, and prescribed a muscle relaxant, anti-inflammatory medicine, and ibuprofen.

On March 20, 2014, an X-ray was taken of Plaintiff's lumbar spine due to lower back pain. The height and alignment of the vertebral bodies were normal, but there was disc space narrowing at the L5-S1 level, which was characterized as a degenerative change. However, the remaining intervertebral disc level showed no significant abnormalities. R. 455.

On December 16, 2014 Plaintiff saw her podiatrist for a Diabetic foot check with normal results. R. 507. Plaintiff was diagnosed with Onychomycosis of her toenails, bilateral calluses, and hammer toe. Her toenails and calluses were debrided. Plaintiff was also scheduled for a diabetic shoe fitting. R. 508-09.

On December 23, 2014, Plaintiff's Ophthalmologist, Dr. Michael Tedford, MD, assessed Plaintiff with diabetic oculopathy associated with type II diabetes mellitus, retinal vascular disorder, incipient senile cataract, and vitreous degeneration. R. 518. However, Dr. Tedford found no macular edema or diabetic retinopathy and directed Plaintiff to return in one year. R. 521.

On April 14, 2015, in a follow up visit related to her diabetic foot care, Plaintiff's exam performed by Dr. David Kim, DPM, was normal. R. 526, 694-96. Plaintiff's toenails were debrided and calluses pared. R. 528.

On June 18, 2015, Dr. Peter Graham, MD, completed a consultative exam for Plaintiff. R. 535-39. Dr. Graham discussed plaintiff's history of diabetes, including a hospitalization for hyperglycemia in 2014 and her "questionable history of retinopathy." R. 535.

Dr. Graham further stated that Plaintiff denied paresthesia or numbness in the extremities, R. 535; however, the Court notes that this condition appears in the record both prior to and following this consultative exam. Additionally, Dr. Graham noted Plaintiff's history of low back

3

pain, for approximately seven years, and neck pain, for thirty years, but Dr. Graham did not have lumbar or cervical MRIs available to evaluate. R. 535.

Dr. Graham also noted Plaintiff's reported one-year history of carpal tunnel syndrome in her right hand and that she never had an EMG, or nerve conductions velocity study, to confirm this diagnosis and did not take medication to alleviate it. R. 535-36. Plaintiff also claimed to have had a history of bilateral temporomandibular joint dysfunction ("TMJ") for more than 30 years. R. 536.

Dr. Graham next noted that Plaintiff was hospitalized for a suicide attempt in 2009 and for diabetes in 2014. R. 536.

Additionally, Plaintiff reported to Dr. Graham that she was able to cook, clean, do laundry, shower, bathe, and dress herself, and that she spent the day watching television. R. 536. During her physical examination, Plaintiff did not appear to be in acute physical distress, her gait and station were normal, she needed no help changing for the exam, and was able to rise from her chair without difficulty. R. 537. Plaintiff had pain on flexion/extension of the cervical spine, but she had full range of motion. Her lateral flexion was negative bilaterally and lateral rotation was normal. Dr. Graham found no abnormality in her thoracic spine, and her lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. There was some tenderness on palpation of the left paralumbar area. Plaintiff's straight leg raising test was negative bilaterally. She had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally; and Full range of motion of her hips, knees, and ankles. Plaintiff's joints were stable and nontender. R. 537-38. Her strength was 5/5 in upper and lower extremities, and her hand and finger dexterity were intact with a grip strength of 5/5 bilaterally. R. 538.

Dr. Graham diagnosed Plaintiff with diabetes mellitus, low back pains with some tenderness present, neck pains, and a history of carpal tunnel syndrome. R. 538. Plaintiff's prognosis was stable, and Dr. Graham concluded that Plaintiff had no limitations in sitting, standing, walking, lifting, carrying, handling objects, hearing, and speech. R. 538.

On July 21, 2015, Plaintiff again saw her podiatrist, Dr. Kim, for diabetic foot care. Her diagnoses were unchanged, and her toenails were debrided and calluses pared. R. 723.

On August 16, 2015, Plaintiff visited urgent care with complaints of severe left wrist pain. R. 726. Her wrist was swollen and warm to the touch, but no recent trauma was indicated other than a fall 1-2 weeks prior in which she thought she landed on her right wrist. R. 726. Plaintiff was advised to keep a splint on, apply ice and heat, and follow up with orthopedics as soon as possible. R. 731.

The following day, an X-ray was taken of Plaintiff's left wrist and no evidence of an acute fracture or dislocation was found. Diffuse degenerative changes were present, but the X-ray was otherwise unremarkable. R. 732.

On March 14, 2015, Hemlata Jenelle Carr, DNP, referred Plaintiff to ENT, R. 771, after Plaintiff requested a referral to pain management for pain related to TMJ. R. 766.

On December 16, 2016, Plaintiff complained of pain in ball of her foot and toenails to Dr. Afsana Qader, DPM. R. 668. Plaintiff was diagnosed with tinea unguium (also known as onychomycosis, or a fungal infection of the nail); type II diabetes mellitus with diabetic polyneuropathy; soft tissue disorder, with pain in right and left toes; and other specified acquired deformities of the musculoskeletal system. R. 668. Plaintiff's painful lesion on her foot was debrided, customized padding was applied, and her fungal toenails were debrided. R. 668.

On March 24, 2017, Dr. Qader added a diagnosis of hallux valgus, or a bunion. R. 669. Plaintiff received the same treatment as the previous visit, and Dr. Qader ordered a pair of therapeutic diabetic shoes. R. 669-70.

On April 3, 2017, Plaintiff complained of numbness in her hands and arms and ringing in her ears. R. 599-600. She was assessed with a numbness and tingling sensation of the skin; tinnitus, bilateral; and hyperlipidemia. R. 601. A family nurse practitioner recommended a referral to a specialist. R. 603.

On May 18, 2017, an X-ray was taken of Plaintiff's left foot which noted no fracture, dislocation or bony destruction, a very slight hallux valgus deformity, and no acute osseous abnormality. R. 673.

On May 19, 2017, Plaintiff complained to Dr. Qader of painful lesions and toenails; they were again debrided. R. 671.

On June 1, 2017, Plaintiff complained to her Neurologist, Dr. Syed Nasir, MD, that she had been suffering from paresthesia for a year in both hands, which was described as moderate to severe, tingling, and worse at night. Additionally, Plaintiff complained of neck pain and lower back pain, both also moderate to severe. Plaintiff denied weakness. R. 617. An exam by Dr. Nasir noted numbness in the lateral 3 1/2 fingers on the palms and otherwise unremarkable results. R. 617. Plaintiff was assessed with neck pain, bilateral carpal tunnel syndrome, and lumbar radicular pain. Dr. Nasir recommended an MRI and physical therapy for her neck pain, wrist splints for the Carpal tunnel, and an MRI and pain management for the lumbar pain. R. 617.

On June 7, 2017, Plaintiff saw Dr. Mitchell Kolker, MD, complaining of ringing in her ears. R. 619. Dr. Kolker noted that, other than impacted cerumen, or earwax, which was

removed on the visit, a physical exam was unremarkable. R. 619. Following an abnormal complete audiometric evaluation, Plaintiff was assessed with tinnitus, bilateral and mild sensorineural hearing loss ("SNHL"). R. 620; 659-64.

On June 9, 2017, Plaintiff again complained of pain in the ball of her foot, her lesions were debrided, and she had a diabetic shoe fitting. Dr. Qader noted that the shoe fit well, and Plaintiff ambulated around the office with no apparent distress. R. 672.

As recommended by Dr. Nasir, on June 15, 2017, an MRI was taken of Plaintiff's cervical spine in connection to her neck pain. R. 674-75. The MRI revealed a reversal of the normal cervical spine lordosis, mild spinal stenosis at C3-4 and C4-5, left paracentral posterior disc osteophyte complexes flattening the left hemicord at C5-6 and C6-7, and multilevel severe neuroforaminal narrowing. R. 675. X-rays of Plaintiff's knees were also taken, and no acute fracture or dislocation was identified, but there was a small suprapatellar effusion in both knees. R. 676, 677.

On June 19, 2017, an MRI was taken of Plaintiff's lumbar spine, R. 678-79. The MRI showed a disc annulus bulge with a superimposed disc herniation at the L5-S1 level. The herniation was central to left paracentral, and it appeared to contact and displace posteriorly the descending S1 nerve root. Additionally, there was a minimal disc annulus bulge at L4-5 with facet arthropathy, as well as ligamentous hypertrophy. R. 679.

On June 16, 2017, Plaintiff complained to a nurse practitioner, Noelle Petrone, of pain in the side of her buttocks and running down her left leg and left side back pain, claiming a history of sciatica. Plaintiff denied any numbness and tingling of her lower extremities. R. 621. Ms. Petrone noted that Plaintiff was in mild pain and distress, which was elicited by walking, raising

her left leg, bending her knee, and touching her toes. R. 623. Plaintiff was diagnosed with sciatica and prescribed a muscle relaxer and ibuprofen. R. 624.

On June 20, 2017, Plaintiff had an abnormal EKG and was referred to cardiology. R. 631.

On June 29, 2017, Dr. Tedford again noted that Plaintiff had "[n]o diabetic retinopathy." R. 640.

On July 6, 2017, Plaintiff had a cardiology follow-up with Dr. John Tighe, MD. R. 646. Plaintiff's "problem" list contained an abnormal EKG, for which an echo and stress echo test were ordered; Hyperlipidemia, for which she was prescribed atorvastatin calcium; and tobacco use. R. 646.

On July 12, 2017, Plaintiff saw Dr. Qader again for pain in the ball of her foot related to diabetes mellitus and other soft tissue disorders in her left and right ankles and feet. R. 666. Plaintiff's lesions were debrided, customized padding was applied to her shoes, and custom orthotic was discussed and recommended. R. 666.

On July 27, 2017, Dr. Michael Cho performed an evaluation of Plaintiff concerning her neck and back pain. R. 657-58, 797-98. Dr. Cho noted that Plaintiff was rear-ended by a truck and her neck pain had worsened. Plaintiff was also experiencing numbness in the first two digits of her left hand. Dr. Cho noted that there was no weakness in her extremities, Plaintiff wore a wrist splint which was helpful, she had no true radicular pain, she had just begun physical therapy for her back, and her medications were minimally helpful. R. 797.

Dr. Cho also averred that an MRI of Plaintiff's cervical spine revealed reversal of the normal cervical lordosis, a disc bulging at C3-4 and C4-5 with bilateral neural foraminal compression, and Plaintiff had a large disc ridge complex on the left side compressing the neural foramen at C5-6 and C6-7. An MRI of her lumbar spine revealed a moderate left L5-S1 disc

8

herniation. R. 797. A neurosurgery examination found that Plaintiff was alert and oriented x3, with cranial nerve testing normal, and normal strength. Dr. Cho assessed Plaintiff with cervical disc herniation and lumbar disc herniation. R. 798. Dr. Cho further noted that the findings of the cervical MRI were moderate and not severe, and that Plaintiff could pursue conservative care; and, concerning her lumbar spine, "the disc is moderate in size and her symptoms should improve with conservative care. She will think about surgery and get back to us." R. 798.

### 2. Mental Health History

On March 4, 2013, Dr. Abdul Qayyum, MD, noted that Plaintiff had a history of depression and post-traumatic stress disorder. R. 353-54; *see also* R. 370. At that time, Plaintiff saw Dr. Qayyam for medication management related to her mental health issues.

On March 26, 2013, Plaintiff reported to Ann Verbraak, CASAC-T, that she lost her job due to using marijuana. R. 356. Plaintiff reported that she last used marijuana on January 26, 2013. Plaintiff also reported a history of trying to harm herself, social isolation, hospitalization for mental illness, and trauma related to working at the FBI, including the Oklahoma City bombing and the terrorist attack of 9/11. R. 357. Additionally, Plaintiff reported that she was sexually abused as a child. R. 357-58.

Plaintiff tested negative for marijuana throughout day rehab and began a less intensive level of care as a result; she was discharged from the program on June 21, 2013. R. 403.

Plaintiff has been prescribed and taking Neurontin, Wellbutrin, and Celexa regularly since at least 2013 with only occasional changes in prescriptions and dosage. *See, e.g.*, R. 354, 370, 437-38.

On April 1, 2014, Dr. Saeed Bhatti increased her dosage of Wellbutrin after she reported she was feeling more anxious. R. 462-63.

On October 7, 2014, Plaintiff reported to Dr. Bhatti that she felt depressed due to her father's stroke, was not able to sleep, had stretched her medications for a few months, lost some weight, and was eating only once a day. R. 493. Plaintiff claimed she had no thoughts to hurt herself. R. 493. She was prescribed only Wellbutrin and Celexa. R. 494.

On December 19, 2014, Plaintiff first saw Hugh McKenzie, PNP, for medication management. R. 510-12. McKenzie's notes stated that Plaintiff's therapist was Sandy Rivera, LCSW. Subsequent records consistently name Ms. Rivera as Plaintiff's therapist throughout the relevant period. McKenzie noted that Plaintiff's mood was "ok," she got depressed at times due to increased stressors at home, had some difficulties sleeping as she did not get her Neurontin on the last visit, she was tolerating medications well, and was alert and oriented x3. Plaintiff was prescribed Celexa, Wellbutrin, and Neurontin. Plaintiff completed a patient health questionnaire ("PHQ-9"), which measures the degree of her depression severity, and the result was 3, which signifies less than mild depression. Plaintiff was diagnosed with depression and a history of Posttraumatic Stress Disorder ("PTSD").

On January 16, 2015, Plaintiff reported to McKenzie that her sleep had improved, her mood was good, she was tolerating her medications well with no side effects reported, but she would get tired with Neurontin at times. McKenzie reported that Plaintiff was alert and oriented x3, her mood was "ok," and she had some depressive symptoms at times but no paranoia or delusions. R. 522. Plaintiff's PHQ-9 score was again a 3. R. 522-23. Additionally, Plaintiff had decreased energy, a symptom of anhedonia. Plaintiff was diagnosed with anxiety depression and depression. R. 523.

On May 4, 2015, Plaintiff reported to McKenzie that she was fired from her job due to her lack of child care, she had no insurance so was taking her medications off and on, her mood

was depressed, and that she had a lot of stressors and some irritability; but she denied paranoia, delusion, and hallucination. Plaintiff's PHQ-9 score had increased to an 8 (mild depression). R. 530. McKenzie noted that Plaintiff suffered from depression most of the day, decreased energy, difficulty concentrating, low self-esteem, difficulty falling asleep, and racing thoughts. However, she was awake, alert, appropriately dressed, well-groomed, and cooperative. Plaintiff was again diagnosed with depression and anxiety depression, and Vistaril was added to her prescribed medications. R. 531.

On June 1, 2015, Plaintiff reported to NP McKenzie that her mood was depressed, her home life was not happy, and that she did not have job. She also reported that Vistaril was helping her sleep, but she had only taken it three times in the previous month. Her PHQ-9 score remained an 8 (mild depression). R. 702. McKenzie noted that Plaintiff suffered from depression most of the day, decreased energy, difficulty concentrating, low self-esteem, and difficulty falling asleep. Plaintiff's mood was depressed, labile, and her affect was labile. R. 702. The remainder of Plaintiff's symptoms were the identical to her previous visit.

On June 22, 2016, Plaintiff reported that her mood was depressed and that she had an accident on April 15, 2015. She was tolerating medications well and sleeping better with her medications. Her depression remained mild with a PHQ-9 score of 8. R. 716. McKenzie noted that Plaintiff had decreased pleasure in life and decreased energy. Other than Plaintiff's affect being appropriate for the situation, Plaintiff's symptoms remained substantially similar to her previous visit. Plaintiff's diagnoses and medications also remained the same. R. 717-18.

On June 18, 2015, Dr. Leslie Helprin, MD, completed a psychiatric consultative exam of Plaintiff. R. 541-45. Plaintiff reported difficulty falling asleep, though she was able to sleep with medication, and a loss of appetite and corresponding weight loss of 20 pounds. R. 542. Dr.

Helprin asked Plaintiff about her depression, and Plaintiff reported crying spells, irritability, decreased appetite, not wanting to go out, and neglecting self-care. Concerning her anxiety, Plaintiff reported having nightmares more than two times per week related to a motor vehicle accident in April 2015, episodes of sweating, not wanting to go out, anger, and that she was arguing with others daily. She also reported short-term memory difficulties and that she was distracted easily. Regarding her history of PTSD, Plaintiff stated that during the terrorist attack of 9/11, she was employed by the FBI in Florida and they were blamed for the terrorist attack; and she reported she was at the Oklahoma City bombing where she saw people mutilated. R. 542.

Additionally, Plaintiff reported that she had fleeting suicidal thoughts two weeks prior to the exam but had no current plan or intent and had not attempted suicide in the past. Dr. Helprin did not consider Plaintiff a threat to herself. R. 542. Plaintiff admitted to having tried marijuana in 1983. R. 542. Plaintiff also reported that her cousin molested her when she was age 8 or 9. R. 542.

In Dr. Helprin's mental status evaluation, Plaintiff was found to be cooperative, and her manner of relating, social skills, and overall presentation were adequate. R. 542. Plaintiff's appearance was the same as her age, she dressed appropriately, was well groomed, her posture and motor behavior were normal, and her eye contact was appropriately focused. R. 542-43. Plaintiff's speech was fluent and clear, thought processes were coherent and goal-directed, affect was dysphoric, mood was dysthymic with some tearing, and her sensorium was clear. R. 543. Plaintiff was oriented x3, her attention and concentration was impaired due to depression, she was able to count from 1 to 10 forwards and backwards and do simple addition but not subtraction, and was unable to do serial 3s.

Plaintiff's recent and remote memory skills were mildly impaired due to depression. Plaintiff's intellectual skills were estimated to be below the average range, but her general fund of information was appropriate to experience. Plaintiff's insight and judgement were good.

At the time of the exam, Plaintiff was able to dress, bathe, and groom herself; knew how to cook and clean, could do laundry and shopping but needed a friend to help her carry the bundles, but was limited in cooking due to physical problems. R. 543-44. Additionally, Plaintiff became overwhelmed when cleaning, could not balance a checkbook, tended to pay bills late, and reported impulse spending. Plaintiff stated that she was able to drive and use public transportation but would only do so with a friend due to a fear of getting lost. Also, when travelling in New York City she had a fear of being attacked and pushed on the train tracks. Plaintiff averred that she had a good relationship with and was able to take care of her son, she socialized with friends, but she was resentful of her father and brother. Plaintiff's hobbies included watching TV and shopping online, but she had been decreasing her online shopping. R. 544.

In Dr. Helprin's Medical Source Statement, Dr. Helprin noted that, regarding vocational skills, Plaintiff had *no limitations* in her ability to follow and understand simple directions and instructions nor to cognitively perform simple and complex tasks independently; to make appropriate decisions; and to relate adequately with others whom she encounters. However, Plaintiff had *marked limitations* in her ability to maintain attention and concentration due to depression; to maintain a regular schedule due to depression; and to deal with stress due to depression. R. 544.

Dr. Helprin concluded that the "[r]esults of examination are consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily

basis." R. 544. Plaintiff was diagnosed with persistent depressive disorder, nightmare disorder with posttraumatic features, and adjustment disorder with anxiety, mild episodic. R. 544. Plaintiff's prognosis was fair given the continued provision of psychological and psychiatric treatments. R. 545. Dr. Helprin also opined that Plaintiff was not able to manage her own funds due to impulse spending and skill limitations. R. 545.

On June 20, 2015, Plaintiff reported to Dr. Dillard Elmore DO, that she had not been taking her medications for the last 3-4 months. R. 710.

On July 27, 2015, Dr. J. Alpert, in completing an "Electronic Request for Medical Advice" from the New York Office of Temporary and Disability Assistance and, after reviewing medical records through April 14, 2015, opined that he "would not find her limited to low contact work." R. 548. Dr. Alpert's reasoning was provided in Plaintiff's Disability Determination Explanation of the same date. R. 108-19. Dr. Alpert summarized the evidence above, including Dr. Helprin's findings and Plaintiff's activities of daily living ("ADL") report, and concluded that Plaintiff was not disabled. R. 116-18. Notably, Dr. Alpert found that Dr. Helprin's opinion "[was] not congruent with the totality of the data on file, including the data in [Plaintiff's] ADL 3876." R. 116.

From July 14, 2015 to July 20, 2017, Plaintiff continued to regularly see Mr. McKenzie, who reported substantially consistent findings throughout this time period. R. 719-22, 733-34, 737-38, 741-42, 757, 762-64, 773-74, 781-84, 566-68, 571-79, 586-90, 605-09, 611-15, 626-29, 650-52. Plaintiff reported varying degrees of depression, self-esteem, difficulty sleeping, symptoms of anhedonia, and tendency to isolate, but consistently tolerated her medications well, was alert and oriented x3, able to ventilate feelings, and had no paranoia or delusions. On September 28, 2015, McKenzie increased her dosage of Wellbutrin and Celexa. On February 20,

2017, Plaintiff was diagnosed with mood disorder and was prescribed Seroquel while her Vistaril was discontinued. Plaintiff's sleep generally improved on the Seroquel, as did her mood disorder, although her Seroquel was increased once on May 17, 2017. Otherwise, Plaintiff's medications remained consistent. The Court notes that on January 21, 2016, Plaintiff saw McKenzie for the first time in three months and reported that she had not been taking her medications regularly. On Plaintiff's final visit in the record with McKenzie, on July 20, 2017, McKenzie noted that Plaintiff had been in a lot of neck and back pain which affected her mood but had been sleeping better at night with her Seroquel. McKenzie noted that Plaintiff's depression and anxiety depression had improved while the remainder of her symptoms, diagnoses and medications remained substantially the same. Plaintiff's PHQ-9 scores consistently registered mild depression with scores ranging between 7 and 8. On March 17, 2016, her score lowered to 5 but, after her father passed away, it returned to an 8 on April 25, 2016 and stayed in that range for the remainder of the records.

On one occasion, on November 3, 2015, Plaintiff saw Ingrid FrengleBurke, NP, for a gynecological follow up visit, R. 746, and FrengleBurke noted that Plaintiff's PHQ-9 score was a 22 (severe depression). R. 748. FrengleBurke also noted that Plaintiff was alert and cooperative; had a normal mood and affect; and had normal attention span and concentration. R. 751.

On July 19, 2017, McKenzie completed a Mental Impairment Questionnaire. R. 684-88. Plaintiff's diagnoses were mood disorder; depression major, recurrent, moderate; hyperlipidemia; and TMJ disorder. McKenzie noted that Plaintiff had been compliant with treatment. McKenzie's clinical findings included lack of interest and focus, poor memory, depressed mood, and anxiety. Plaintiff's prognosis was fair. R. 684.

Plaintiff's symptoms included anhedonia, appetite disturbance with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, difficulty thinking or concentrating, recurrent and intrusive recollection of a traumatic experience, which are a source of marked distress, change in personality, emotional withdrawal or isolation, easy distractibility, memory impairment, and sleep disturbance. R. 685.

As to Plaintiff's mental abilities and aptitudes needed to do unskilled work, McKenzie concluded that Plaintiff had *no useful ability to function* in remembering work-like procedures, sustaining an ordinary routine without special supervision, completing a normal workday and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress; that she was *unable to meet competitive standards* in maintaining attention for two hour segment, working in coordination with or proximity to others without being unduly distracted, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and being aware of normal hazards and taking appropriate precautions; and that she was *seriously limited but not precluded from* understanding and remembering very short and simple instructions, carrying out very short and simple instructions, maintaining regular attendance and being punctual within customary, usually strict tolerance, making simple work-related decisions, and asking simple questions or requesting assistance. R. 686.

Under mental abilities and aptitudes needed to do semiskilled and skilled work, Plaintiff had *no useful ability to function* in understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with stress of semiskilled and skilled work; and

she was *unable to meet competitive standards* in setting realistic goals or making plans independently of others. R. 687.

Under mental abilities and aptitudes needed to do particular types of jobs, Plaintiff was *seriously limited but not precluded from* adhering to basic standards of neatness and cleanliness, and traveling to unfamiliar places; and she was *limited but satisfactory* in interacting appropriately with the general public, maintaining socially appropriate behavior, and using public transportation. R. 687.

In terms of Plaintiff's functional limitations, McKenzie opined that Plaintiff had a *marked limitation* in her activities of daily living and in maintaining concentration, persistence or pace, and a *moderate limitation* in maintaining social functioning. R. 688.

**C. Plaintiff's Activities of Daily Living Report**

On May 18, 2015, Plaintiff completed a Function Report, in which she described her activities of daily living ("ADL report"). R. 277-89. Plaintiff explained that on a typical day she would feed and help clothe her son and father, send her son off to school, give her dad his medications, wash dishes, and lay down and watch television. On occasion, she would clean the house, and she tried to take her son to his activities and help him with his homework. R. 278.

Plaintiff stated that her brother helped her with taking their father to his doctor appointments as she was unable to lift his wheelchair. She also clarified that she had trouble taking her son to activities and doctor appointments, could not cook every day, did not like to go out much, and slept during the day sometimes. She further explained that she had trouble sleeping at night due to worry but was taking medication for that.

In terms of her personal care, Plaintiff did not get dressed every day unless she had to go out for a medical appointment and did not bath and comb her hair every day. She needed reminders to complete all these activities. R. 278, 280.

Plaintiff prepared meals daily and would sometimes make hamburgers, spaghetti, cereal, or frozen dinners. However, she was not eating three meals a day due to a lack of appetite and no desire to cook. R. 279-80. In terms of household chores, Plaintiff washed clothes and dishes, vacuumed, and mowed, although she needed help mowing the lawn, as well as making repairs to her dad's home and keeping up with cleaning the house. R. 279. Plaintiff left the home at least three times per week. She would walk, drive and ride cars. She stated that she could go out alone and had a driver's license. R. 279. Her shopping consisted of shopping in stores and by computer for food and clothing three time a week. R. 281.

Plaintiff averred that she was able to pay bills but not count change or handle a savings account, her illnesses affected her ability to handle money, she was spending more and having trouble saving, and she was buying things she did not need and paying bills late. R. 281.

Plaintiff's social activities included going to a friend's house to talk and watch television and looking at friends' pictures on Facebook once or twice a week. R. 282. Plaintiff explained that she when she was feeling well, she would take her son to his activities four days a week. She had problems getting along with her father and brother. Also, since her illness began, she had less contact with her friends. R. 282.

Plaintiff also noted that her ailments affected her ability to sit for long periods of time because she would get backaches and her arm and hand would go numb occasionally. R. 283. Plaintiff complained that her diabetes affected her eyesight. Plaintiff also had difficulties paying attention. R. 284. She was able to complete tasks, such as chores, but had to take breaks and

would at times forget to complete the chores. R. 284. Plaintiff reported that she could follow spoken and written instructions; did not have a problem getting along with bosses, teachers, police, landlords or other people in authority; and had never lost a job because of problems getting along with other people. R. 284

However, stress or changes in Plaintiff's schedule would make her very anxious, have trouble focusing, want to give up, start sweating, and would cause her jaw start hurting. R. 285. Plaintiff was prescribed a jaw splint to deal with her worsening TMJ, which she claimed would affect her ability to think. Her neck pain was also worsening. Plaintiff further claimed that she had trouble remembering things, such as appointments and paying bills on time.

As to her anxiety, Plaintiff stated that it began after 9/11 and resulted in an increase in worrying, bad dreams, and trouble sleeping. R. 287. Plaintiff reported that she saw Sandy Rivera once a week, Dr. Bhatti, and Mr. McKenzie every month for her anxiety. R. 288. Plaintiff concluded that her anxiety had not resulted in any difficulties in socializing with other people. R. 288.

### D. Hearing Testimony

On October 18, 2017, Plaintiff, in Goshen, New York, appeared with counsel via video before ALJ McCormack in White Plains, New York. R. 58-107; *see also* R. 11. Plaintiff's counsel began the hearing by informing the ALJ that there had been changes to Plaintiff's medical records in September of 2017. Plaintiff started pain management, had a surgical consult, began physical therapy, received an injection for spine issues, and consulted a surgeon. R. 61-62. However, Plaintiff's counsel assured the ALJ that "it's more of a just a continuation of the same issues and underlying everything with regard to her physical health that you already have in the file," R. 62, and after being asked several times, Plaintiff's counsel assured the ALJ that the

record was complete, R. 63-65. Additionally, Plaintiff's counsel averred that the psychiatric treatment had remained the same. R. 62.

With the Vocational Expert ("VE") present, the ALJ began by questioning Plaintiff about her work history. R. 66. From 2002 to 2009, Plaintiff was an operations security assistant for the FBI. As to her specific duties, she was a switchboard operator, radio dispatcher, performed security patrols, took calls from the public, and collected confidential trash in bags weighing 20-30 pounds and carried it to a shredder. R. 70. The VE was then sworn in and testified that this job was a "composite" of security guard (light with an SVP of 3) and switchboard operator (sedentary with an SVP of 3, or semiskilled work). R. 72, 77. The VE added that Plaintiff performed this job at the medium exertion level. R. 72.

The ALJ next continued with his examination of Plaintiff, and Plaintiff testified that she was terminated from this job at the FBI after she told her employer that she smoked marijuana, and due to her roommate being arrested. R. 73.

In 2011, for three or four months, Plaintiff was employed by Parent Management Company as a manager for an apartment complex. R. 75.

From 2014 to early 2015, Plaintiff was a customer service representative for the Golf Channel. R. 73. She took calls over the phone to book golf tee times and, if customers did not make their tee time, she would issue refunds. R. 74. Plaintiff described it as "[m]ore of a desk job." R. 74. The VE categorized this job as a reservation clerk (sedentary, SVP 5, skilled work). R. 74-75. Plaintiff testified that she was terminated because she was always late, but this was related to her psychiatric ailments stemming from 9/11, which she described as a "fear of going out" or that "something's going to happen." R. 78.

The ALJ then questioned Plaintiff about her alleged disabilities. R. 77. Plaintiff testified that she had been suffering from depression and anxiety since 9/11. R. 77. She added that she does not like being in public or with crowds and does not like loud places. R. 79. When asked whether she socialized, Plaintiff responded that she did not have any friends.

Plaintiff next testified that she had problems with focusing and maintaining attention, including short-term memory issues. R. 79. She stated that she no longer watched TV or read because it was "not fun anymore," and could not get on the internet anymore because of her neck problems. R. 80. She added that although the liked to go to her son's activities, she could not sit for two hours and did not drive anymore because she had trouble turning her neck since her accident in 2015. R. 80.

As a result of her marijuana use, Plaintiff was in an outpatient drug treatment program from March to June 2013. R. 81. Plaintiff further testified that 2013 was the last time she used marijuana. R. 82

Plaintiff testified that her psychiatric medications included Wellbutrin, citalopram, gabapentin, and Seroquel, and that they helped "somewhat," R. 82, but Gabapentin made her sleepy, R. 83. Plaintiff added that a muscle relaxant she was taking also made her sleepy. R. 83. Plaintiff stated that she had been taking these medications since she was admitted to the psychiatric ward in 2011. R. 82.

As to Plaintiff's diabetes, she testified that it was under control with a special diet, and she was not on any medication for this. R. 83-84.

The ALJ also asked Plaintiff about her diagnoses of hearing loss and tinnitus, to which Plaintiff replied that she had hearing loss and did not like loud noises, but she did not wear hearing aids. R. 84.

Plaintiff also testified concerning her April 2015 car accident in which she rear-ended a truck. She went to urgent care following the accident with back problems. R. 84-85. The ALJ then directed Plaintiff's attention to Dr. Graham's internal medical exam. Dr. Graham noted that Plaintiff claimed to have had a history of back problems for seven years and neck pains for 30 years and that she denied any previous injury. R. 85-86. Plaintiff denied reporting that she had neck pain for 30 years. R. 86-87.

The ALJ then turned to Dr. Cho's report and diagnoses of cervical and lumbar disc herniation and asked whether Plaintiff was on any pain medication. R. 87. Plaintiff responded that she had been taking opiates but was not any longer due to kidney issues; rather, she was just taking over the counter pain medications at that time. R. 87. The ALJ then asked Plaintiff to tell him about her neck and back problems. Plaintiff explained that she had trouble looking down at things, for example at papers or a keyboard, and had trouble reading for the same reason. Plaintiff further testified that she had tried physical therapy, but the pain had progressed to a point where she was considering surgery. R. 88. As to her lower back, Plaintiff stated that it hurt when she stood a lot and that shopping was difficult. R. 88. Her son's father was helping by taking her son to activities, doing the grocery shopping, mowing the lawn, and "things like that." R. 89.

When asked to describe a typical day, Plaintiff testified that she would wake up at 8 or 9 a.m., go to doctor appointments every day, or every other day, she typically would not eat breakfast, she would take her medications, and she would lie down a lot while she waited for son to come home. R. 89-90. Plaintiff also stated that she could dress herself and bath or shower, but she did not really cook, and doing the dishes was difficult. R. 90. However, she shopped for food sometimes and had a driver's license, but she had not driven for at least a year. R. 91.

On direct examination by her attorney, Plaintiff testified that her back and neck had gotten worse after she passed out and fell approximately four months prior to the hearing due to taking Seroquel for the first time. R. 92. Her neck, however, gave Plaintiff the most problems, and she experienced pain every day. R. 93. Plaintiff had been going to physical therapy, and to the pool, for her back in order to avoid surgery. R. 93. Additionally, she had taken epidural shots which she claimed did not work. She testified that she was going to go for a cervical facet injection but, if it did not work, she would have to have surgery. R. 93-94.

Additionally, Plaintiff testified that she had sciatica bilaterally and it radiated down her left and right legs. R. 94. Plaintiff stated that she had to lie down every two hours in order to deal her neck pain. R. 94. She also iced her neck and took muscle relaxers. R. 94-95.

Plaintiff's counsel questioned Plaintiff regarding her mental health, and she testified that it had also been getting worse since she lost her father in March. R. 95. She further testified that she had been seeing her therapist, Sandy Rivera, every other week since 2011. R. 96.

Finally, Plaintiff testified that she had a history of suicidal thoughts which were still ongoing, and she suffered from TMJ. R. 97.

The ALJ then provided the VE with a series of hypotheticals concerning Plaintiff's job prospects. R. 98. The ALJ's first hypothetical was as follows: "Assume an individual that's the same profile as here and the individual can perform the full range of work at all exertional levels. The individual can work in low stress jobs, defined as jobs containing no more than simple, routine, repetitive tasks involving only simple work-related decisions, with few, if any workplace changes." R. 99. The VE first concluded that Plaintiff could not perform any past relevant work and had no transferrable skills, R. 99; however, she could perform the following light or medium jobs: Hand packager, DOT code 920.587-018, medium with SVP of 2, and 162,000 positions

available in the national economy; store laborer, DOT code 922.687-058, medium with SVP of 2, and 100,000 positions; and laundry folder, DOT code 369.687-018, light with SVP of 2, and 440,000 positions. R. 99-100.

The ALJ's second hypothetical was the same as hypothetical one, but the "individual cannot maintain a regular schedule on a consistent basis. Further, the individual could only work at jobs allowing at least four absences at work every month." R. 100. The VE concluded there were no jobs that person could perform. R.100.

The third hypothetical was also hypothetical one, but "instead of the full range of work at all exertional level though, it's now light. So it's light work with the low stress jobs as defined in the first hypothetical." R. 100-01. The VE concluded that the third occupation from hypothetical one, laundry folder, still applied, as well as housekeeper, DOT code 323.687-014, light with SVP of 2, and 443,000 positions; and cashier, DOT code 211.462-010, light with SVP of 2, and 1.2 million positions. R. 101.

Hypothetical four was the same as the third, but the ALJ substituted sedentary work for light. R. 102. The VE determined that this individual could perform the following jobs: order clerk, DOT code 209.567-014, sedentary with SVP of 2, and18,000 positions; charge account clerk, DOT code 205.367-014, sedentary with SVP of 2, and 15,000 positions nationally; and document preparer, DOT code 249.587-018, sedentary with SVP of 2, and 91,000 positions nationally. R. 102.

Hypothetical six was the same as the fourth, but "the individual could only work at jobs allowing the individual to be off task by at least 15 percent of the day during the course of an eight hour workday." R. 102-03. There were no jobs this individual could perform. R. 103.

Finally, hypothetical six was the same as the third, "light with low stress as defined," but with the same limit as above, "limit[ed] [to] being off task 15 percent of the day during the course of an eight hour workday." This hypothetical also was found to preclude employment. R. 103.

## III.    THE ALJ'S DECISION

The ALJ issued his decision on November 24, 2017 following the standard five-step inquiry used for determining disability. R. 8-30. In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity since April 2, 2015, the alleged onset date. R. 13.

At step two, the ALJ found that several of Plaintiff's medical issues—lumbar disc herniation, cervical disc herniation, depression, and anxiety—rose to the level of "severe." R.13. The ALJ also outlined Plaintiff's "[n]onsevere impairments" and noted that he "considered all the claimant's medical determinable impairments in determining her residual functional capacity ["RFC"]." R. 14. These nonsevere impairments included a history of carpal tunnel syndrome (citing Dr. Graham's conclusion of no limitations, discussed *supra*); diabetes and Plaintiff's resulting illnesses, discussed *supra*; mild bilateral tinnitus and hearing loss; small suprapatellar effusion of the knees; and headaches. R. 14. The ALJ also noted Plaintiff's marijuana use in 2013 and that there had been no use since the alleged onset date. R. 14.

At step three, the ALJ decided that Plaintiff's impairments did not meet or medically equal the "Appendix 1" impairments. R. 15. The ALJ considered listings 1.02, 1.04, 12.04, and 12.06.

The ALJ determined that Plaintiffs impairments do not meet listing 1.02 as "claimant ha[d] not established that she meets the requisite conditions. Specifically, the claimant neither

established that she is unable to ambulate effectively, nor established that she is unable to perform fine and gross movements effectively." R. 15.

The ALJ concluded that Plaintiff did not meet listing 1.04 "because the record does not demonstrate compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings" found in Listing 1.04 sections (A), (B), and (C), discussed *infra*. R. 15.

Listings 12.04 and 12.06 are met if the claimant can establish the existence of either depressive, bipolar or related disorders or anxiety and obsessive-compulsive disorders, respectively, *and* satisfy the requirements in either paragraph B *or* C. The ALJ considered paragraphs B and C of 12.04 and 12.06 and concluded that the "severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria" of these listings. R. 15-18. In his evaluation of the paragraph B criteria, the ALJ discussed the findings in Dr. Helprin's exam, Plaintiff's hearing testimony, and Plaintiff's ADL report and found that Plaintiff had moderate limitation in understanding, remembering, and applying information; no limitation in interacting with others; moderate limitation in concentration, persistence, or maintaining pace; and moderate limitation in adapting and managing oneself. R. 17-18. Thus, "the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation," and "the 'paragraph B' criteria [were] not satisfied." R. 17. Finally, the ALJ also concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." R. 17.

Between steps three and four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). R. 19-24. The ALJ concluded that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that claimant can work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only

simple work related decisions." R. 19.  In reaching this conclusion the ALJ considered Plaintiff's

symptoms, the extent to which her symptoms were consistent with objective medical evidence

and other evidence, and opinion evidence.  The ALJ first considered Plaintiff's ADL report.  The

ALJ listed the activities which Plaintiff stated she could perform and also noted that she did not

have many friends, argued with family, could not sit for long periods due to back pain and

numbness in her arm and hand, had problems paying attention and remembering things, and had

difficulty with stress or changes in schedule. R. 19.  The ALJ next outlined Plaintiff's hearing

testimony, discussed *supra*, and found that "the claimant's medically determinable impairments

could reasonably be expected to produce the above alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in the this decision." R. 20.

The ALJ next discussed the medical evidence in the record, including the treatment

records for Plaintiff's depression and anxiety (R. 522-25, 550-658, 605-10, 690), Dr. Helprin's

June 18, 2015 consultative exam, McKenzie's July 19, 2017 Mental Impairment Questionnaire,

Dr. Graham's June 18, 2015 consultative exam, the June 2017 MRIs of Plaintiff's cervical and

lumbar spine, Dr. Cho's July 27, 2017 report concerning her neck and lower back pain, and Dr.

Alpert's July 27, 2015 report. R. 20-23.

Additionally, the ALJ discussed the opinion evidence in the record and accorded weight

to the opinions of Dr. Alpert, Dr. Graham, Dr. Helprin, and NP McKenzie. R. 23-24.  The ALJ

accorded significant weight to Dr. Alpert's opinions, including that Plaintiff would have limits in

her stress tolerance associated with limits in her persistence and pace but that she retains the

capacity to understand and follow directions, sustain concentration, relate adequately, and adapt

27

to changes. R. 23. The ALJ also accorded significant weight to Dr. Alpert's opinion that the CE of Dr. Helprin was "not congruent with the totality of the data on file, including the data in [Plaintiff's] own ADL" report. R. 23.

Accordingly, the ALJ gave the opinions of Dr. Helprin little weight because Dr. Alpert refuted the marked limitations in Dr. Helprin's report, and because Dr. Helprin's opinions were inconsistent with records from Cornerstone between January and July 2017. R. 23. The ALJ also noted that Plaintiff reported to Dr. Helprin that she tried marijuana in 1983 but that this was inconsistent with her treatment for drug rehabilitation in 2013 and the fact that Plaintiff lost her job with the FBI due to her admission of marijuana use. Thus, the ALJ opined, Dr. Helprin did not factor in Plaintiff's history of marijuana use when she rendered her opinions of marked limitations and, due to this and the reasons above, Dr. Helprin's opinion was only entitled to little weight. R. 23.

On the other hand, the ALJ gave little weight to Dr. Graham's opinion that Plaintiff had no physical limitations, instead opining that "the claimant has a capacity for light work." R. 23.

Finally, the ALJ gave NP McKenzie's July 2017 report, R. 684-89, little weight as it was inconsistent with his own clinical findings from January 2016 through July 2017, discussed *supra*. R. 24. The ALJ reasoned that other than subjective reports of anxiety and depression, McKenzie's notes otherwise demonstrated "normal mental status examinations with normal speech and thought content." R. 24.

The ALJ concluded his RFC analysis by stating that "the totality of the evidence . . . reflects a capacity for at least light work," and the psychiatric "clinical findings . . . evidence a capacity for low stress and simple work as defined above." R. 24.

At step four, the ALJ considered whether the claimant would be able to perform any past relevant work and concluded that she could not. R. 24-25.

At step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 25-26 (citing the testimony of the vocational expert, *supra*).

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied her application for benefits. R. 26.

## IV.   LEGAL STANDARD

### A.   Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (*per curiam*).

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of*

*Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

### B.  Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant can obtain substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## V.   ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the ALJ's determination on two grounds: (1) the ALJ's RFC failed to account for Plaintiff's severe exertional impairments; and (2) the ALJ failed to fulfill his duty to develop the medical record. Finding that the ALJ failed to adequately develop the medical record, I do not reach Plaintiff's claim that the ALJ's RFC analysis was inadequate.

### A. Duty to Develop the Medical Record

Plaintiff argues that the ALJ failed to fulfill his duty to develop the record in that the ALJ should have contacted NP McKenzie for an explanation of his findings; should have obtained treatment notes from Sandy Rivera, plaintiff's social worker and therapist; should have contacted Dr. Cho for a further explanation of his findings; and should have requested a "proper RFC statement" from Dr. Graham. Defendant contends that the ALJ had sufficient evidence to evaluate Plaintiff's mental condition and that, as to her physical ailments, Dr. Graham's examination was adequate and, thus, the ALJ was not required to obtain additional evidence.

It is well-settled that the ALJ has an affirmative obligation to develop the record. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Whether the ALJ has fulfilled his or her duty to develop the record is a threshold issue." *Matos v. Berryhill*, No. 13 Civ. 5062, 2017 WL 2371395, at *15 (S.D.N.Y. May 4, 2017) (Report & Recommendation), *adopted* 2017 WL 2364368 (May 30, 2017). "The ALJ must seek additional evidence or clarification where the documentation from a claimant's treating physician, psychologist, or other medical source is inadequate . . . to determine whether the claimant] is disabled." *Matta v. Colvin*, No. 13 Civ. 5290, 2016 WL 524652, at *9 (S.D.N.Y. Feb. 8, 2016) (quotation marks and citation omitted). "To be sure, the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (citation omitted). Additionally, "[t]he duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *Velez v. Colvin*, No. 14 Civ. 3084 (CS)(JCM), 2017 WL 1831103, at *17 (S.D.N.Y. May 5, 2017) (quoting *Hidalgo v. Colvin*, No. 12 Civ. 9009, 2014

WL 2884018 at *4 (S.D.N.Y. June 25, 2014)); *see also Matos*, 2017 WL 2371395, at *15; *Clark v. Comm'r of Soc. Sec.*, No. 15 Civ. 8406, 2017 WL 1162204, at *3 (S.D.N.Y. Mar. 27, 2017); *Piscope v. Colvin*, 201 F. Supp.3d 456, 463 (S.D.N.Y. 2016).

### 1. Mental Health Medical Records

Plaintiff argues that the ALJ cherry-picked from NP McKenzie's opinions, "choosing only those findings which supported his ultimate decision," and that due to McKenzie's consistent findings of mild depression, which conflicted with a finding of severe depression at a November 3, 2015 Ob-Gyn appointment, the ALJ "could have contacted Mr. McKenzie for more explanation of his findings." Dkt. 15 at 25. Additionally, Plaintiff argues that because she saw her social worker, Sandy Rivera, every week or two, as opposed to having only brief meetings once a month for medication management with McKenzie, Ms. Rivera's notes "could [have] shed important light on Plaintiff's day-to-day mental functioning and work-related limitations." *Id.* at 26. Moreover, Plaintiff argues that due to Dr. Helprin's more severe mental health findings, Rivera's notes "could likely have provided further insight into the severity of Plaintiff's mental impairments," and "it was the ALJ's duty to seek these records as LCSW Rivera likely had the greatest insight into Plaintiff's mental difficulties." *Id.*

Defendant argues that the ALJ had sufficient evidence to consider concerning Plaintiff's mental health functioning and, thus, there were no gaps in the treatment record. As to McKenzie's opinion, Defendant contends that "the ALJ properly gave limited weight to Mr. McKenzie's opinion based on the conflict between his restrictive assessment and the normal mental status findings documented in his treatment notes" and, regardless, McKenzie is a Nurse Practitioner and, thus, not an acceptable medical source under the regulations. Dkt. 19 at 35. And as to Ms. Rivera's notes, Defendant asserts that Plaintiff never reported Ms. Rivera as a

treating source in her disability reports, instead listing only Greater Hudson Valley Family Health Center ("GHVFH") as a treating source, and that, in any event, Ms. Rivera is also not an acceptable medical source. However, the Court notes that in Plaintiff's ADL report, Plaintiff named the doctors who treated her for anxiety as Sandy Rivera, who Plaintiff claimed she saw once a week; Dr. Bhatti; and Mr. McKenzie, who she saw once a month. R. 288. Additionally, in her recent medical treatment form, dated July 7, 2017, Plaintiff listed Ms. Rivera as a treating source, R. 337, and throughout McKenzie's medication management notes, as discussed *supra*, Ms. Rivera is consistently named as Plaintiff's therapist.

In Plaintiff's medical record, there is no "acceptable" treating medical source, pursuant to 20 C.F.R. § 404.1513(a), who has provided an opinion regarding Plaintiff's mental health. "However, an ALJ's failure to request medical source opinions is not *per se* a basis for remand where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC].'" *Greenhaus v. Berryhill*, No. 16 Civ. 10035 (RWL), 2018 WL 1626347, at *9 (S.D.N.Y. Mar. 30, 2018) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)); *see Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (absence of a medical source statement from a claimant's treating physician is not always fatal to the ALJ's determination). In *Tankisi*, the Second Circuit found that, even in the absence of a formal opinion from a treating physician regarding claimant's RFC, the "voluminous" medical record (which included an informal assessment of claimant's limitations from a treating physician and opinions from at least two consulting physicians) provided a sufficient basis for the ALJ's RFC determination. *Tankisi*, 521 F. App'x at 34. "Courts have distinguished *Tankisi* and remanded where the medical record available to the ALJ is not 'robust' enough to obviate the need for a treating physician's opinion." *Hooper*, 199 F. Supp.3d at 815; *see Downes v. Colvin*, No. 14 Civ.

7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (ALJ erred in failing to obtain treating physicians' medical opinions despite evidentiary record which contained treatment notes and "direct assessments of [the claimant's] functional capacities" from consultative physicians); *Sanchez v. Colvin*, No. 13 Civ. 6303, 2015 WL 736102, at *6-7 (S.D.N.Y. Feb. 20, 2015) (failure to obtain treating psychiatrist's opinion "was a gaping hole in the record" which, although it included at least two consulting physicians' opinions, was a "far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician opinion based on the completeness and comprehensiveness of the record."); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (remanding where "medical records discuss [claimant's] illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). In sum, the need for a treating source's medical source statement hinges "on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez*, 2015 WL 736102, at *5.

Although nurse practitioners and social workers are not "acceptable medical source[s]" as defined in 20 C.F.R. § 404.1513(a), "it is possible for the opinion of a non-acceptable medical source with a particularly lengthy treating relationship with the claimant to be entitled to greater weight than an 'acceptable medical source' . . . who has rarely had contact with the claimant." *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011). To be sure, the controlling regulation did not *require* the ALJ to re-contact McKenzie to resolve the inconsistency; instead, it afforded the ALJ the *option* to do so. *See* 20 C.F.R. § 404.1520b(b)(2)(i). Nonetheless, that regulation "contemplate[s] the ALJ recontacting treating physicians when the additional information needed is directly related to that source's medical opinion." *Reynoso v. Colvin*, No.

13 Civ. 5587, 2015 WL 1378902, at *13 (S.D.N.Y. Mar. 26, 2015) (internal quotation marks and citations omitted). Further, in cases (like the one at bar) where re-contacting the treating source is "the best, if not the only" way to resolve the apparent inconsistency, "it is incumbent upon the ALJ to do so." *Gabrielsen v. Colvin*, No. 12 Civ. 5694, 2015 WL 4597548, at *6-7 (S.D.N.Y. July 30, 2015) (ALJ obligated to recontact treating psychiatrist who "would best be able to resolve" perceived inconsistencies between her treatment notes and her report); *see also Reynoso*, 2015 WL 1378902, at *14 (citing 20 C.F.R. §§ 404.1520b(c)(1), 416.1520b(c)(1) and finding "[e]ven where a claimant is represented by counsel . . .,[i]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician.") (internal quotation marks and citation omitted).

Here, NP McKenzie is the only treating source in the record with knowledge of Plaintiff's longitudinal mental health treatment, and the ALJ accorded his opinion little weight. Moreover, Ms. Rivera is the only named treating source with seemingly an even greater knowledge of Plaintiff's mental health history. As to whether McKenzie and Rivera should have been further consulted by the ALJ, the question is whether, on circumstances of this case, the record was sufficiently comprehensive to permit the "ALJ [to] reach an informed decision based on the record." *Sanchez*, 2015 WL 736102, at *5. I find that it was not.

The ALJ gave controlling weight to Dr. J. Alpert, a consulting physician who, on July 27, 2015, completed the RFC for the initial level of Plaintiff's disability determination. R. 108-16, 120-31. In part based on Dr. Alpert's opinion that Dr. Helprin's more severe findings "[were] not congruent with the totality of the data on file, including the data in [Plaintiff's] own ADL" report, the ALJ accorded Dr. Helprin's June 18, 2015 consultative opinion little weight. As

discussed above, the ALJ gave the July 19, 2017 opinion of NP McKenzie—as noted the only treating source in the record who regularly treated Plaintiff throughout the relevant period—little weight, reasoning that McKenzie's opinion was inconsistent with his own clinical findings. Plaintiff argues that NP McKenzie should have been consulted regarding the alleged inconsistencies between his treatment notes and medical source statements and that Plaintiff's social worker, Ms. Rivera, should also have been consulted to fill in these alleged gaps in the record. I agree.

Considering that "[g]reat weight should not be accorded to the opinion of a non-examining State agency consultant whose opinion is based on an incomplete record that lacks the opinion of the claimant's primary treating psychiatrist," *Coleman v. Colvin*, No. 14 Civ. 2384, 2015 WL 1190089, at *10 (S.D.N.Y. Mar. 16, 2015), it was incumbent upon the ALJ to resolve the alleged inconsistency between NP McKenzie's opinion and notes. The ALJ failed to do so.

Moreover, though Rivera was named as a treating source by Plaintiff, she worked with McKenzie, and—based upon the GHVFH and Cornerstone treatment notes—she provided treatment to Plaintiff on a weekly or bi-weekly basis, the ALJ did not request treatment records from Rivera. Rivera's observations may have influenced McKenzie's assessment of the severity of Plaintiff's impairments, and her notes could have been helpful in explaining the alleged inconsistencies. On remand, the ALJ should obtain the therapy notes in order to more fully develop the record.

Accordingly, because "the inconsistencies at issue here likely can be explained by [NP McKenzie and Ms. Rivera's notes], and given the heightened duty to develop the record in cases of mental impairment discussed above, the Court finds that the ALJ had an obligation to re-contact [NP McKenzie and request the treatment notes of Ms. Rivera] to seek clarifying

information." *Gabrielsen*, 2015 WL 4597548, at *7 (collecting cases).

## 2. Physical Impairment Medical Record

Plaintiff first contends that "Dr. Graham's findings do not rise to the level of an adequate CE examination, and it is error for the ALJ to rely on them." Dkt. 15 at 27. Specifically, Plaintiff argues that "an RFC analysis, which is a requirement of an adequate CE examination, was not provided. POMS [Programs Operations Manual System] DI 22510.015 requires such analysis from the CE source, who expresses an opinion about what a claimant can still do despite her impairments. If this information is missing, POMS DI 22510.010 requires that the CE source be re-contacted to supply the missing information or issue a revised or corrected report." R. 15 at 17 n.3. However, the POMS does not require all that which Plaintiff asserts. Though it does require "[a] medical opinion (MO) from the CE source expressing an opinion about what the claimant can still do despite his or her impairment(s)," and defines MO as "a medical opinion about the adult claimant's ability to do work-related activities," it clarifies that "[w]hile we ordinarily request an MO as part of the CE process, the absence of an MO does not make a CE report incomplete. However, the report must be complete enough to enable an independent reviewer to determine the nature, severity and duration of the impairment(s) and, in adult claims, the claimant's ability to perform basic work-related functions." POMS DI 22510.015(B)(1), (2).

Plaintiff adds in her reply that Dr. Graham's conclusion was a "very vague and general statement that is of no use to the ALJ in formulating the RFC," and that Dr. Graham's examination took place more than two years prior to the hearing date. R. 20 at 5. However, Dr. Graham did provide a medical opinion, as required by the POMS, in which he concluded that Plaintiff had no limitations in sitting, standing, walking, lifting, carrying, handling objects, hearing, and speech. Moreover, the remainder of Dr. Graham's CE complied with the guidelines

set out in the POMS sections cited by Plaintiff. Accordingly, the content of Dr. Graham's report alone did not create an obvious gap in the record requiring the ALJ to re-contact Dr. Graham for a "proper" RFC statement. Indeed, the ALJ found in Plaintiff's favor, according Dr. Graham's opinion that Plaintiff had no limitations only little weight, concluding that Plaintiff had more limitations than those contained in the CE and, thus, limiting Plaintiff's RFC to light work. R. 23. However, the fact that Dr. Graham's report was completed two years prior to Plaintiff's MRIs is relevant to the Court's consideration and is discussed below.

Plaintiff also argues that due to the alleged inadequacy of Dr. Graham's CE; the fact that the CE took place two years prior to Plaintiff's cervical and lumbar MRIs, which Plaintiff alleges demonstrate bilateral nerve root compression; and "because Dr. Cho characterized Plaintiff's musculoskeletal or orthopedic impairments as moderate," Dkt. 20 at 3, "it was the ALJ's obligation to clarify with Dr. Cho what the objective medical evidence may mean for Plaintiff's ability to engage in SGA," Dkt. 15 at 27. Plaintiff adds in his reply that this alleged gap in the record could have been corrected either by a medical expert testifying at the hearing, an updated consultative examination, or a medical source statement from Dr. Cho. Dkt. 20 at 3. Ultimately, Plaintiff argues that the MRIs taken of her cervical and lumbar spine on June 15, 2017 demonstrate that Plaintiff meets, or medically equals, listing 1.04, and the ALJ failed to fully develop the record which would have established this fact.

Listing 1.04 requires that Plaintiff demonstrate a disorder of the spine—such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture—resulting in the compromise of a nerve root or the spinal cord, along with (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle

weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); (B) spinal arachnoiditis; or (C) lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04.

Without analysis, the ALJ concluded that Plaintiff's impairments did not *meet* this listing. R. 15. Notably, other than a conclusory statement in the heading of his step three analysis that Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of *any* listing, the ALJ does not appear to have considered specifically whether Plaintiff's impairments *medically equaled* listing 1.04, *see* R. 15, and, "[a]t step three, the ALJ is *required* to determine whether the Plaintiff's impairment or combination of impairments is of a severity to meet *or medically equal* the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1." *Donaldson v. Berryhill*, No. 2:17 Civ. 2000 (ADS), 2018 WL 4845740, at *3 (E.D.N.Y. Oct. 4, 2018) (Emphasis added).

As discussed *supra*, Plaintiff's MRI of her cervical spine revealed, *inter alia*, mild spinal stenosis, multilevel flattening of hemicords, and multilevel severe neuroforaminal narrowing. R. 674-75. In other words, the MRI demonstrated a diagnosis of spinal stenosis along with possible nerve root compression, both requirements of listing 1.04A. Moreover, Dr. Cho's finding that the spinal stenosis of the cervical spine was "most probably responsible for her symptomology," R. 797, could support a finding of neuro-anatomic distribution of pain. The record is less clear, however, regarding whether Plaintiff suffered from limitation of motion of the spine and motor loss accompanied by sensory or reflex loss. The ALJ did not clarify which of these requirements Plaintiff failed to satisfy and, as noted, did not explore whether Plaintiff's other ailments in the record could have medically equaled this listing.

Though the ALJ did not elaborate at step three, he appears to have relied on the findings of Dr. Cho and Dr. Graham. Dr. Cho, in a report discussed by the ALJ only later in his RFC analysis, concluded in a brief note that the findings in Plaintiff's cervical MRI were moderate and not severe and recommended conservative care. R. 798. However, as discussed, the MRI results included multilevel *severe* bilateral neuroforaminal narrowing. R. 674-75. Additionally, the ALJ did not consult Plaintiff's neurologist, Dr. Nasir, who Plaintiff listed as a treating physician and who requested the subject MRIs be taken and ordered a follow up visit with Plaintiff when the results were available, R. 617; and there is no opinion evidence, or any report, from Dr. Nasir concerning the results of Plaintiff's MRIs in the record even though the records indicate that the results were sent to him, R. 674-75, 678-79, 682-83. Moreover, the ALJ did not seek an updated CE from Dr. Graham, on whose opinion the ALJ also relies, even though Dr. Graham was not able to review the subject MRIs. Further, the ALJ also did not call a medical expert to testify at the hearing as to whether Plaintiff's conditions met, or medically equaled, Listing 1.04. Though by itself not error requiring remand under the facts of this case, *see Schildwachter v. Berryhill*, No. 17 Civ. 7277 (VEC)(SN), 2019 WL 1116256, at *7 (S.D.N.Y. Feb. 8, 2019), *report and recommendation adopted*, No. 17 Civ. 7277 (VEC), 2019 WL 1115026 (S.D.N.Y. Mar. 11, 2019), the failure to call a medical expert reinforces my conclusion that the ALJ failed to adequately develop the record.[1]

---

[1] Moreover, the SSA's Hearings, Appeal and Litigation Law Manual ("HALLEX") states that "[a]n ALJ must obtain testimony from an ME [medical expert] in order to determine whether the claimant's impairments medically equal a medical listing." *See* HALLEX 1-2-6-70 (Testimony of a Medical Expert) (S.S.A.), 1993 WL 751901 (citing SSR 86-8 and SSR 96-6p). Although failure to follow HALLEX procedures is also not error *per se*, this HALLEX directive provides additional support to my conclusion. *See Gallo v. Colvin*, No. 15 Civ. 9302, 2016 WL 7744444, at *12 (S.D.N.Y. Dec. 23, 2016), *report and recommendation adopted sub nom. Gallo v. Comm'r of Soc. Sec.*, 2017 WL 151635 (S.D.N.Y. Jan. 12, 2017), and *report and recommendation*

An obvious gap exists in the record as it concerns Plaintiff's cervical MRI findings. Other than the opinion of Dr. Graham, which was from 2015 and accorded little weight by the ALJ, the ALJ considered no other opinion evidence, including medical expert testimony at the hearing, regarding Plaintiff's spinal conditions; and there is no opinion evidence in the record discussing Plaintiff's 2017 MRIs. Thus, the ALJ appears to have based his decision on Dr. Graham's opinion and Dr. Cho's sparse note. "Having [ ] failed to request any additional records or support from [Dr. Cho, Dr. Nasir, Dr. Graham, or a medical expert], the ALJ was left to base h[is] conclusions on incomplete information that was necessarily 'conclusive of very little.'" *Rosa v. Callahan*, 168 F.3d 72, 79–80 (2d Cir. 1999) (quoting *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 861 (2d Cir. 1990)). "Had the ALJ pursued additional information from any or all of these sources, it is at least possible that the record would have included sufficient information to sustain plaintiff's claim of disability." *Id.*

Accordingly, "it is unclear from the ALJ's decision which criteria of Listing 1.04A, which is the relevant listing for spinal disorders, the plaintiff failed to meet [or medically equal] . . . . In light of the ALJ's failure to explain his reasoning and the conflicting [and insufficient] medical evidence in the record, this Court cannot conclude by looking at 'sufficient uncontradicted evidence' that the ALJ's decision was supported by substantial evidence." *Norman v. Astrue*, 912 F. Supp. 2d 33, 41 (S.D.N.Y. 2012).

The ALJ's conclusion at step three regarding Plaintiff's lumbar spine was similarly not supported by "sufficient uncontradicted evidence." *Id.* Plaintiff's lumbar MRI revealed disc herniation, disc annulus bulges, and bilateral mild narrowing of the neural foramina of the

*adopted sub nom. Gallo on behalf of M.G. v. Comm'r of Soc. Sec.*, 2017 WL 1215219 (S.D.N.Y. Mar. 31, 2017).

lumbar spine, or spinal stenosis,[2] that "appear[ed] to contact the descending S1 nerve root and displace it posteriorly," R. 678-79, findings which appear to satisfy certain criteria of Listing 1.04A. Defendant argues that because there is no evidence in the record of any positive straight leg raising test and because there is evidence that Plaintiff had normal reflexes, sensation, and muscle strength, Plaintiff did not satisfy all of the required criteria in Listing 1.04 and, thus, cannot meet the listing. Dkt. 19 at 26-27 (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Although it is true that there is no evidence of a positive straight leg raising test in the record, the only straight leg raising test in the record was performed by Dr. Graham in his 2015 examination of Plaintiff. R. 537-38. And although, as Defendant suggests, there is some evidence in the record indicating that Plaintiff had "normal reflexes, sensation, and muscle strength," Dkt. 19 at 17, the ALJ, again, relied on the two-year old opinion of Dr. Graham and the sparse note of Dr. Cho who found that "the [lumbar] disc is moderate in size and her symptoms should improve with conservative care." As above, there is no opinion evidence in the record addressing the lumbar MRI, and the ALJ's failure to seek opinion evidence has left a gaping hole in the record. *See Rosa*, 168 F.3d at 79–80. Furthermore, the ALJ again failed to consider whether Plaintiff's ailments medically equaled this listing and did not specify which of the criteria Plaintiff failed to satisfy. *See Norman*, 912 F. Supp. 2d at 41.

Accordingly, the Court will remand this case to the Commissioner for further development of the record.

---

[2] "Spinal stenosis is narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column." *See* https://medlineplus.gov/ency/article/000441.htm.

## VI.  CONCLUSION

This case is remanded to the Commissioner to further develop the record.  On remand, the ALJ should solicit medical opinions from Dr. Graham, Dr. Cho, and Dr. Nasir; seek clarification from NP McKenzie; and request notes from Ms. Rivera. The ALJ should then reconsider Listing 1.04 at step three and the ALJ's RFC determination with respect to both Plaintiff's physical and mental impairments.[3]  The ALJ may also wish to consider calling a medical expert to testify at the hearing.

For the reasons set forth above, the Defendant's motion for judgment on the pleadings is **DENIED** and the Plaintiff's motion for judgment on the pleadings is **GRANTED** to the extent that the case be **REMANDED** for further administrative proceedings consistent with this Decision & Order pursuant to 42 U.S.C. § 405(g), sentence four.


The Clerk of the Court is respectfully requested to terminate the pending motions (Dkts. 14, 18).


Dated: March 2, 2020
       White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

---

[3] Finding that the ALJ failed to adequately develop the record, I do not reach Plaintiff's contention that the ALJ failed to account for Plaintiff's severe exertional impairments in his RFC. *See* R. 15 at 21-27.  Without an adequately developed record, a threshold requirement, the Court cannot even begin to address the ALJ's RFC analysis. *See, e.g.*, Velez v. Colvin, No. 14 Civ. 3084 (CS) (JCM), 2017 WL 1831103, at *17 (S.D.N.Y. May 5, 2017).